**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

———————————————————

NARVIN LICHFIELD,

     Plaintiff - Appellant,

v.

KATHERINE KUBLER; NETFLIX, INC.,

     Defendants - Appellees.

No. 25-4135

———————————————————

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:24-CV-00458-JNP-CMR)**

———————————————————

Ross P. Meyer of Enara Law, Scottsdale, Arizona (Michael K. Hepworth of Hepworth Legal, Bountiful, Utah, on the briefs) for Plaintiff-Appellant.

Natalie J. Spears of Dentons US LLP, Chicago, Illinois (David W. Tufts and Ian M. Kinghorn of Dentons Durham Jones Pinegar P.C., Salt Lake City, Utah; Gregory R. Naron and Jacqueline A. Domenella of Dentons US LLP, Chicago, Illinois, with her on the brief) for Defendants-Appellees.

———————————————————

Before **TYMKOVICH**, **BACHARACH**, and **FEDERICO**, Circuit Judges.

———————————————————

**FEDERICO**, Circuit Judge.

———————————————————

Narvin Lichfield operated boarding schools and programs for purportedly "troubled teens" for more than three decades. During this time, these boarding schools – as well as the broader industry – drew attention from the public and press for allegations of extreme disciplinary techniques that allegedly crossed the line into physical and mental abuse. Katherine Kubler is a filmmaker who, as a teenager, spent fifteen months at a facility for troubled teens that billed itself as a high school (even though it was not accredited to award diplomas). While she was enrolled, Kubler swore that she would one day get revenge by making a documentary about her experience.

Kubler did ultimately create a documentary about her boarding school. The documentary took the form of a three-part series that also discussed the larger troubled-teen industry. So, although he did not supervise or direct the school Kubler attended, Lichfield was featured during one episode for his affiliation with an industry organization and other schools for troubled teens. Netflix produced the documentary and streamed it on its platform. When Lichfield sued Kubler for defamation, he also named Netflix as a Defendant. The district court dismissed Lichfield's complaint because it failed to state a claim for which relief could be granted. He appealed to this court.

2

This dispute, then, brings into conflict two sets of values honored by our legal system. On the one hand, Lichfield seeks recompense for what he alleges is unlawful defamation of his character. But, on the other hand, Kubler and Netflix seek refuge in their free-speech rights to make and distribute a film about a topic of public importance. Determining the boundary between these competing interests – free speech versus defamation – is the topic of this appeal. In the end, we agree with the district court and affirm.

## I

## A

Long before Kubler entered the world of professional filmmaking, she was a troubled high-school student. During her teenage years, she "started acting out," by drinking, smoking, and sneaking out at night. The Program: Cons Cults and Kidnapping, *Part 1: Where the F\*\*\* Am I?!* at 6:37 (Netflix 2024) (hereinafter The Program) (on file with the Clerk's Office).[1] As Kubler

---

[1] Because this case comes to us on appeal of a motion to dismiss for failure to state a claim, we accept as true the well-pleaded facts of the operative complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Throughout the Amended Complaint, Lichfield references The Program, and its precise content is central to his claims. The parties do not dispute the authenticity of the recording that has been filed with the Clerk's Office and ask that we treat it as incorporated into the Amended Complaint by reference. Consistent with our jurisprudence, we will do so. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).

tells it, she was engaged in "typical teenager stuff" related to a fraught relationship with her stepmother. *Id.* Kubler begged her father to send her "somewhere, anywhere" away from her stepmother. *Id.* at 6:45. Then, midway through her sophomore year, Kubler transferred to a private religious boarding school. After a few months, the boarding school expelled her for violating its alcohol policy.

Following her expulsion, Kubler waited in the principal's office for her father's arrival. Instead, two strangers arrived with handcuffs. Kubler's father had hired them without her knowledge to escort her to a new school: Academy at Ivy Ridge (Ivy Ridge). Soon after her arrival, Kubler learned Ivy Ridge was not a typical high school. She was strip searched for contraband upon her arrival at campus. She would not be free to come and go. And, until she could prove her good standing, she could not call her parents on the phone.

Good standing could be earned through compliance with a multitudinous list of rules that included prohibitions on talking to other students, making eye contact, and looking out the window. The restroom could only be used under the supervision of the staff. Compliance with the rules could earn students "upper-level privileges," which permitted them to talk to their peers, wear makeup, and look out the window. *Id.* at 16:00.

4

When students earned enough points to progress through the various levels, they could finally leave the program.

Ivy Ridge was not a freestanding program. It was affiliated with the World Wide Association of Specialty Programs and Schools (WWASP). WWASP itself is no stranger to controversy; it has come under public scrutiny in connection with allegations of abuse and neglect at affiliated institutions. *See, e.g., World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1135–36 (10th Cir. 2006) (detailing news reports). It was also highly profitable, in part due to steep attendance fees and relatively low expenses. And, by Kubler's telling, Narvin Lichfield – whose brother, Robert, founded WWASP – was instrumental in building WWASP into an "empire of troubled teen programs." The Program, *Part 3: Follow the Money* at 24:43. The dispute now before this Court is predicated on the character and truthfulness of statements made about Lichfield's involvement with WWASP and several facilities connected with it.

Kubler, for her part, never completed the program at Ivy Ridge or earned a high-school diploma. Instead, her father pulled her out of Ivy Ridge after fifteen months. By then, Kubler's relationship with her father was severely damaged. In an attempt to get her "big revenge" against the school's staff, The Program, *Part 1* at 27:15, through which she might "get all this evidence together" about her experience "and present it to [her]

5

dad," The Program, *Part 2: Mind Control* at 27:51; *accord* The Program, *Part 3*, at 50:10, Kubler made a documentary about Ivy Ridge and schools like it, The Program *Part 1* at 27:15, 27:47. The series that Kubler directed and produced, and that Netflix also produced, contains the speech that eventually led to Lichfield's lawsuit.

The series' three episodes are built around and filtered through Kubler's personal experience as a child at home and at Ivy Ridge. The first episode, titled *Part 1: Where the F\*\*\* Am I?!*, displays home video footage while describing Kubler's personal conflict with her "evil stepmother" and her transfer to Ivy Ridge. The Program, *Part 1* at 6:30. Kubler later reunites with other students on Ivy Ridge's abandoned campus, where they detail their experiences of physical and sexual abuse at the now-defunct high school. At one point, Kubler opens a Mike's Hard Lemonade alcoholic beverage – possession of which got her sent to Ivy Ridge so many years ago – before wandering the empty halls.

In *Part 2: Mind Control*, Kubler again roams the Ivy Ridge campus holding a Mike's Hard Lemonade. The narrative focus, though, shifts to "seminars" at Ivy Ridge that served as the purported backbone of the program. The Program, *Part 2* at 2:00. Two of Kubler's classmates describe a session in which they were required to repeat an eight-word mantra with associated hand movements for eight hours uninterrupted. The narrator

6

describes these techniques as tantamount to "literal brainwashing," handed down to the "troubled teen industry" from a 1960s-era cult. *Id.* at 8:57, 9:50, 12:09. Over the course of the episode Kubler interviews a friend's parent, sneaks into a seminar for parents of WWASP students, and confronts a former public relations coordinator for Ivy Ridge. The episode culminates with a scene in which Kubler confronts her father about her "complicated feelings" stemming from her time at Ivy Ridge. *Id.* at 53:40, 55:07. Prior to the confrontation, Kubler had not seen her father in person for years. In the scene, her father apologizes for sending her away to Ivy Ridge.

The first two episodes of the series are important for context, but it is the content of *Part 3: Follow the Money* that is central to this legal dispute. The episode begins with one of the series' recurrent tropes: the camera displays a bulletin board to which photos, news clippings, and paper documents have been affixed by thumb tacks. The Program, *Part 3* at 00:18. As the camera cuts between different portions of the bulletin board, Kubler narrates:

> It bothers me how people low on the totem pole end up taking the fall. And the people at the top seem to get away with murder. I knew if I really wanted to go after these places, I'd need to follow the money.

*Id.*

7

Then, as Kubler concludes her remarks, the camera cuts to a wider shot, in which a silhouetted person – apparently Kubler – stands in front of the bulletin board and its array of images, newspaper clippings, and a map of the United States, with string connecting various items. *Id.* at 00:32. Most notable for this appeal, though, is the frame shown when Kubler references "people at the top" seeming to "get away with murder." *See id.* at 00:27. At that moment, the camera rests on a newspaper clipping from the *Salt Lake Tribune* headlined "As Therapy Hikes Reviewed, Another Teen Dies in Program." *Id.* Next to this clipping is an image of a man who has not yet appeared in the series. *See id.* That man is the Plaintiff-Appellant, Narvin Lichfield. A screenshot of this moment in the record is reproduced below.



*Id.*

This image – along with the corresponding statement – comprises the first scene or segment of the series that Lichfield challenges in this appeal as defamatory. By his theory, the juxtaposition of the visuals and narration falsely implies that he is responsible for a teen's death.

The second challenged segment appears midway through the episode. Shortly before it is introduced, Kubler is engaged in an interview with Lichfield's estranged son, who describes his father's decision to open a school in Costa Rica named Dundee. *Id.* at 30:20. Kubler then narrates: "Dundee was only open for nineteen months before authorities were alerted to abuse, raided the facility, and Narvin was arrested." *Id.* at 30:36. The series displays a clip from an episode of the TV program *Inside Edition* contemporaneous to the arrest in which Lichfield told a local news reporter: "We haven't done anything here but try to run a school." *Id.* at 30:43. Kubler, again narrating, says: "Narvin didn't waste any time in rebuilding his Costa Rican facility into a new program called Pillars of Hope, only seven months after his previous program was raided." *Id.* at 30:53. Although Lichfield concedes that the facility was raided and he was arrested, he contends on appeal that this segment is defamatory because it fails to mention that Costa Rican authorities ultimately dismissed the criminal charges against him.

9

The third challenged segment is prefaced by a screenshot of Lichfield's social media post inviting his Instagram followers to join him on a Wednesday night to sing karaoke. *Id.* at 47:33. The image then cuts to Kubler drinking from a pint glass at the karaoke bar while Lichfield takes the stage to sing "Witchcraft" as performed by Frank Sinatra. *Id.* at 47:39. Lichfield dances side to side, and an audio track of Kubler's narration plays:

> It was surreal to see Narvin in person, knowing everything I know about this guy: the children he abused, the parents he conned, all the crimes he's gotten away with. Yet, here he is – free as a bird, singing Frank Sinatra at a club in Utah. I didn't talk to him because I didn't want to blow my cover. And I don't like giving abusers a platform to spew their bullshit.

*Id.* at 48:04.

The narration fades away, Lichfield returns to his seat, and Kubler drinks from a shot glass chased with lime before running to the stage. *Id.* at 48:30. Kubler narrates: "Unlike the Justice Department or FBI, there's nothing I can really do to the Lichfields, except this. But don't get too comfortable Narvin. 'Cuz one way or another, I'm gonna get you." *Id.* at 48:42. She and two friends then perform an off-key version of Blondie's "One Way or Another" while Lichfield looks on bemused.[2] *Id.* at 48:55. On appeal, Lichfield contends that Kubler's statement about abusing children, conning

---

[2] Kubler sings: "One way or another, I'm gonna find ya, I'm gonna get ya, get ya, get ya, get ya // One way or another, I'm gonna win ya, I'm gonna get ya, get ya, get ya, get ya." The Program, *Part 3* at 48:55.

parents, and getting away with crimes is defamatory because it makes provably false assertions of fact.

In total, the third episode is somewhat less personal than the first two episodes. Over the course of *Part 3*, Kubler interviews, *inter alia*: an anonymous staffer from Ivy Ridge, a sociologist, a plaintiff's lawyer, a pair of journalists, a lawyer who previously served in a state attorney general's office, two state legislators, and Lichfield's son. The episode reviews WWASP's purported political connections, and Kubler asks a Utah state legislator to prevent Lichfield's brother, Robert, from operating facilities for troubled teens. The episode, and thus the series, concludes with a clip of Kubler and her friends burning files from Ivy Ridge while the narrator calls her audience to action.

**B**

Lichfield filed the complaint in the District of Utah. He amended his pleading in short order. In the Amended Complaint, Lichfield pleaded five causes of action: defamation, defamation per se, false light invasion of privacy, intentional infliction of emotional distress (IIED), and civil

11

conspiracy. Defendants Kubler and Netflix (collectively, Kubler[3]) responded with a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). She argued in support of dismissal that Lichfield's defamation claim rested upon statements that are non-actionable under Utah law and protected by the First Amendment. And, because Lichfield's remaining claims are derivative of defamation, she argued, they should be dismissed for the same reasons.

In the same filing, Kubler submitted a special motion to strike under state statutory laws governing lawsuits that could chill free expression. These state laws – commonly styled Anti-Strategic Lawsuits Against Public Participation (anti-SLAPP) statutes – may provide for, *inter alia*, attorneys' fees if a court determines that a lawsuit was filed to chill First Amendment-protected speech. *See Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 662 (10th Cir. 2018). In her special motion, Kubler argued that Utah and California laws are interchangeable for the purposes of attorney fee awards and, in the alternative, that California's anti-SLAPP statute should apply because Defendants are based there.

---

[3] Kubler and Netflix are jointly represented, filed a joint brief, and have aligned interests in affirmance of the district court's opinion. To the extent that there is any daylight between their legal interests, it is not relevant here. For brevity, we refer to their joint arguments with only the lead Defendant's name.

12

Lichfield opposed both the Rule 12(b)(6) motion and the special motion under anti-SLAPP law. He argued that neither the First Amendment nor Utah law doomed his claims. He further argued that the district court should apply Utah's anti-SLAPP statute, not California's similar law. Also, he argued that a district court applying the Utah statute would conclude it "essentially mimics the language of Rule 12(b)(6)" and could proceed to apply the anti-SLAPP law by conducting a traditional Rule 12(b)(6) analysis. Aplt. App. at 241 (citation omitted). This analysis, Lichfield argued, would result in the conclusion that the Amended Complaint surmounted the Rule 12 standard and would allow his claims to proceed to discovery.

The district court saw it otherwise. It determined that all the contested statements were either opinions protected under state law and the First Amendment, did not imply any defamatory statements, or were true statements and thus not actionable. And because Lichfield could not state a claim for defamation, his remaining derivative claims also failed.

Regarding the special anti-SLAPP motion, the district court declined to decide whether Utah or California law should apply. Instead, it reasoned that under either statute, a motion to strike would be available when claims are subject to Rule 12(b)(6) dismissal. And, because the Rule 12 standard

13

was met, the district court concluded that Kubler was entitled to recover attorneys' fees and costs.

Lichfield timely appeals.

## II

On appeal, Lichfield presents three issues, though only one is truly central to resolution of the case. The primary question on appeal is the threshold legal question of whether Lichfield has properly alleged that any of Kubler's statements are subject to defamatory meaning. Under Utah defamation law, Utah constitutional law, and the First Amendment, the answer is no, so the claims must be dismissed.

Additionally, Lichfield argues that the district court erred in its application of state anti-SLAPP laws. But any error was invited in the district court. Lichfield further asks for leave to amend the operative complaint.[4] He can show no legal basis for that relief. Exercising jurisdiction pursuant to 28 U.S.C. 1291, we affirm.

---

[4] Although Lichfield also argues on appeal that the district court "prematurely dismissed" the Amended Complaint by declining to decide whether he was a public figure for the purposes of the First Amendment, *see* Op. Br. at 43, there is no error in the district court's resolution of the case on narrower grounds than Lichfield would prefer. Because the merits of this question are not necessary to decide the appeal, we do not decide them.

**A**

We begin with the dismissal of the operative complaint. Because Lichfield appeals from an order issued under Rule 12(b)(6), the district court's determination is reviewed de novo. *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014). In this procedural posture, a court will typically defer to an operative complaint's well-pleaded factual allegations and affirm dismissal only where the plaintiff has failed to state "a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, in addition to the complaint's well-pleaded factual allegations, a court may "consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quotation omitted). Here, because Lichfield's claims are entirely predicated on a three-part documentary miniseries, we will treat the Amended Complaint as incorporating the miniseries, which has itself been filed with both the district court and this court. To the extent that any of the Amended Complaint's allegations are in tension with the record video, the video will govern. *See id.* at 1101, 1105 (citing *Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972)). The parties agree that this is the correct approach.

15

There is another nuance relevant to our review of the Rule 12(b)(6) dismissal in this case. Under Utah law, "whether a statement is capable of sustaining a defamatory meaning is a question of law." *Hogan*, 762 F.3d at 1106 (alteration adopted) (quoting *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994)). In cases alleging defamation, courts must determine at the threshold whether "a publication might be considered defamatory by a reasonable person" before the case may proceed to discovery and, ultimately, a jury trial. *Id.* (quoting *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988)). Thus, as the parties rightly agree, Lichfield receives no deference when he states that the contested portions of the series are capable of defamatory meaning – those are legal conclusions, not factual allegations. *Accord Brokers' Choice*, 861 F.3d at 1100 n.17 (deciding issue of truth on motion to dismiss).

## B

Although Lichfield alleged five different causes of action in the district court, our review on appeal is relatively narrow, at least as a matter of doctrine. This is because the district court predicated its dismissal order on a holding that the statements at issue were incapable of defamatory meaning. And because this element of defamation could not be met, the district court held that Lichfield's derivative claims of defamation per se, IIED, and civil conspiracy also failed. Lichfield does not dispute this reasoning on appeal. Instead, he argues that we should reverse the dismissal of the derivative

16

claims because the district court erred by holding the challenged statements were not defamatory as a matter of law. Thus, Lichfield's primary substantive challenge requires us only to determine whether the three contested segments of The Program: *Part 3* are capable of defamatory meaning.

This case did not arise on a federal claim, and the district court exercised jurisdiction based on the parties' diversity of state citizenship. *See* 28 U.S.C. § 1332. A federal court exercising jurisdiction on the basis of diversity applies state substantive law, *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1162 (10th Cir. 2017), and here the parties agree that Utah law applies to construe Lichfield's claims, *see* Op. Br. at 12; Resp. Br. at 26.

This court has recognized four elements of Utah defamation law, as enumerated by the Utah Supreme Court: "(1) that the defendants 'published the statements'; (2) that the 'statements were false, defamatory, and not subject to any privilege'; (3) 'that the statements were published with the requisite degree of fault'; and (4) that 'their publication resulted in damage' to the plaintiff." *Hogan*, 762 F.3d at 1105 (quoting *West*, 872 P.2d at 1007–08). Here, only the second element is at issue: whether the statements were false, defamatory, and not privileged by law.

Courts have enumerated several ways in which a statement might fail to meet this element. For example, if the statement is itself literally true and does not implicitly "convey a false representation of fact," then it is not capable

17

of defamatory meaning. *Id.* at 1106 (quoting *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir.1977)). Even if the challenged statement may not be literally true, where "a reasonable reader [or viewer] would not accept the statement[] at face value," then it is not defamatory. *Hogan*, 762 F.3d at 1106. Additionally, if a statement does not "impeach[] an individual's honesty, integrity, virtue, or reputation," then it is not defamatory under Utah law. *West*, 872 P.2d at 1008. The First Amendment and Utah's constitutional law each also provide protection for certain opinion statements. *West*, 872 P.2d at 1015, 1017; *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 853 (10th Cir. 1999).

**1**

Applying these legal principles to the contested segments in the series is the challenge of this appeal. Consider first the photo of Lichfield tacked to a bulletin board, juxtaposed to a newspaper headline about a teen's death. To refresh: this scene appears at the opening of *Part 3*, in which the camera quickly moves from point to point on the bulletin board filled with images from Kubler's investigation. She narrates: "It bothers me how people low on the totem pole end up taking the fall. And the people at the top seem to get away with murder." The Program, *Part 3* at 00:27. As Kubler narrates, the camera rests on a newspaper clipping from the *Salt Lake Tribune* headlined "As

18

Therapy Hikes Reviewed, Another Teen Dies in Program." *Id.* Next to it is the image of Lichfield. *See id.*

Lichfield argues that the photo, newspaper clipping, and narration combine to create a defamatory message: that he was involved in the death of a child.[5] This purportedly defamatory message was never directly stated in the series. Instead, "it is the implication arising from the statement and the context in which it was made," that "forms the basis of [Lichfield's] claim." *West*, 872 P.2d at 1011.

A defamation-by-implication claim arising under Utah law is reviewed to determine whether the "the gist of the defendant's statement, rather than its literal meaning is 'false, defamatory, and not subject to any privilege.'" *Hogan*, 762 F.3d at 1105 (quoting *West*, 872 P.2d at 1007). In examining the gist of the episode's challenged segment, courts "conduct a context-driven assessment of the alleged defamatory statement and reach an independent

---

[5] In the Amended Complaint, Lichfield characterized this segment of the series as defamatory because it implies he was "responsible for a murder," Aplt. App. at 17, "either facilitat[ed] or [was] complicit in murder," *id.* at 26, 28, 32, "involved in a murder," *id.* at 34, and because it implicitly "accused [him] of murder, *id.* at 30. In his district court opposition to the motion to dismiss, Lichfield argued that he was falsely accused of "being complicit in or getting away with murder." *Id.* at 225; *accord id.* at 230, 232, 242, 245. To the extent that Lichfield attempts to argue a broader theory on appeal – *see*, *e.g.*, Op. Br. at 35 (construing the series as alleging that "his actions contributed to deadly outcomes in the troubled-teen industry") – it is outside the scope of our review. *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

conclusion about the statement's susceptibility to a defamatory interpretation." *O'Connor v. Burningham*, 165 P.3d 1214, 1222 (Utah 2007). If, in context, "a reasonable reader would not accept the statements at face value," then "the statements do not cause damage to the plaintiff's reputation and are therefore not defamatory." *Hogan*, 762 F.3d at 1106 (citing *Mast v. Overson*, 971 P.2d 928, 933 (Utah Ct. App. 1998)). "In this evaluation of context, we should examine: (1) the words themselves and their implications; (2) the entire article or message; (3) the events or disputes that gave rise to the article; and (4) the likely effect on the reasonable reader." *Id.* (citing Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, *The Law of Torts* § 526 (2d ed. 2014)).

We start by considering the spoken words. Here, Lichfield complains of the narrative statement that "the people at the top seem to get away with murder," in conjunction with a flash to the newspaper headline stating that "Another Teen Dies in Program." The district court was correct that the phrase "get away with murder" is a "common idiom." Aplt. App. at 281. Indeed, it is "usually used figuratively to describe someone who does something very bad or wrong without being criticized or punished." *Get Away with Murder*, Merriam-Webster.com, https://perma.cc/R4EB-5ZUT. It is also true, though, that the term may be used in a literal sense to describe a person's evasion of culpability for homicide. *See, e.g.,* Jed S. Rakoff, *Getting Away With Murder*, New York Review of Books, Dec. 2020 (describing allegations that corporate executives

20

"have literally gotten away with murder" by virtue of deaths connected to faulty products); *Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995) (treating rhetorical question of whether a person could "get away with murder" as contributing to a TV program's suggestion that a man had killed his estranged wife). Here, to the extent that the term "get away with murder" could be taken literally, the headline's words "Teen Dies" might bolster that understanding. That the challenged phrase may – in the abstract – denote Lichfield's proffered meaning does provide some evidence in Lichfield's favor. But this is far from dispositive on its own. *West*, 872 P.2d at 1009 n.15.

Unfortunately for Lichfield, there is little else that supports his argument. In analyzing the "entire . . . message," *Hogan*, 762 F.3d at 1106, it is helpful to bear in mind that a "writing or program is normally viewed as a whole." *Brown*, 54 F.3d at 27 (citing William Prosser & Page Keeton, *Torts* 781 (rev. ed. 1984)). Because the statements challenged in this case arise in the visual medium of documentary film, we find especially helpful the observation that "literary context" may be "critical in interpreting" the series for the existence of defamatory statements. Dobbs at § 526 (2d. ed. 2026). And in viewing all three episodes of the documentary, we agree with the district court that the series repeatedly uses a recurrent trope for an investigative program: a bulletin board filled with documents, maps, images, and news clippings to visually symbolize the effort toward and status of an ongoing investigation.

21

*See, e.g.*, The Accountant 2 (Artists Equity 2025); The Wire, *Game Day* (HBO 2002); *see generally* Only Murders in the Building (Hulu 2021). But the contents of the bulletin board do not necessarily tell a coherent visual story.

For instance, in *Part 1*, the camera pans behind Kubler's back while she looks at the bulletin board and narrates: "For the past decade, I've been investigating the program[.]" The Program, *Part 1*, at 2:11. At this point and from this angle, the bulletin board contains photos of a national politician juxtaposed with a publication titled "Parent Support News" and near a news clipping headlined "Czech school accused of torturing pupils." *See id.* No reasonable viewer would perceive this juxtaposition to allege that the politician endorses "Parent Support News" as a publication or was involved in torture overseas. Instead, a reasonable viewer would understand that the bulletin board is filled with partially refined grist for the mill that is Kubler's investigation into the troubled-teen industry. It may be that placement on the board signifies some degree of relevance to her investigation, but the visual presentation does not go so far as to convey a conclusive link between items and images by virtue of their proximity to one another on a bulletin board.

When our view of the series becomes wider, Lichfield's claim is further imperiled. At the time the viewer encounters the challenged segment, Lichfield has not yet even been introduced by name. And from that point forward, there is no other mention – throughout the entirety of the three-hour series – of

22

death, murder, or homicide as those terms could be taken to relate to Lichfield. The closest Kubler ever gets to this point is a non-specific reference to "crimes." *See infra*. And the primary and motivating event that gave rise to the series, *see Hogan*, 762 F.3d at 1106, was not a death within a facility but instead Kubler's reckoning with her adolescent experience at Ivy Ridge.

The totality of the first challenged segment consists of a passing visual juxtaposition and the use of an idiomatic expression. Any reasonable viewer would understand that if Kubler had meant to accuse Lichfield of involvement in a teen's death, she would say more and say it explicitly at some point in the series. Thus, in this context, no reasonable viewer could accept the phrase "seems to get away with murder" at face value, *cf. Hogan*, 762 F.3d at 1106, but would instead understand it to be "exaggerated rhetoric intended to spark the debate," *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 301 (4th Cir. 2008), about accountability for leaders in the troubled-teen industry. The first challenged segment is not defamatory as a matter of law.

**2**

We next turn to the second segment at issue, wherein Kubler discusses Lichfield's arrest in Costa Rica. About halfway through *Part 3*, the challenged segment is introduced by an interview with Lichfield's son. After the son describes Lichfield's decision to open a school in Costa Rica called Dundee, Kubler narrates: "Dundee was only open for nineteen months before

23

authorities were alerted to abuse, raided the facility, and Narvin was arrested." The Program, *Part 3* at 30:36. The series displays a clip from an episode of *Inside Edition* contemporaneous to the arrest and Kubler further narrates: "Narvin didn't waste any time in rebuilding his Costa Rican facility into a new program called Pillars of Hope, only seven months after his previous program was raided." *Id.* at 30:53.

Lichfield contends that the challenged segment is made defamatory not by what it says but by what it does not say. That is, his Amended Complaint alleges that he was defamed because the series mentions the arrest "without disclosing that he was exonerated, and all charges dismissed at the prosecutor's request." Aplt. App. at 23. According to the Amended Complaint, this omission would lead a reasonable viewer to wrongly conclude that he was convicted of child abuse.

Where an allegation of defamation is predicated on omission rather than commission, the standard for liability is material falsity. *Brokers' Choice*, 861 F.3d at 1108. That is, so long as the matter published is substantially true, the First Amendment will prohibit liability even if the publisher "failed to include additional facts which might have cast plaintiff in a more favorable or balanced light" or decided "to omit facts that may place the plaintiff under less harsh public scrutiny." *Id.* (quotations omitted). And a court will look past "minor inaccuracies" to find a statement substantially true "so long as 'the substance,

24

the gist, the sting'" of the challenged statement "can be justified." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516–17 (1991) (quotation omitted). On the other side of the coin, a statement is materially false only if it "produces 'a different effect on the mind of the [viewer] from that which the pleaded truth would have produced.'" *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1146 (10th Cir. 2000) (quoting *Masson*, 501 U.S. at 517).

To support that he was defamed by omission, Lichfield attempts to distinguish and leverage the difference between an arrest and a criminal conviction. However, such a distinction must be considered against the substantial truth doctrine. After all, this court has credited reasoning that although there is "*some* difference between being a suspected participant in a heinous bombing and being a material witness in the investigation" of that bombing, a defamation action cannot proceed on such a distinction. *Bustos v. A & E Television Networks*, 646 F.3d 762, 768 (10th Cir. 2011) (citing *Nichols v. Moore*, 477 F.3d 396, 398, 401 (6th Cir. 2007)). So, to the extent that a "respectable community member" would find the difference between an arrest and a conviction "significant enough to make the misstatement actionable," *id.*, we doubt that same viewer would reason in the first instance that Lichfield's arrest was tantamount to his guilt and subsequent criminal conviction. That is, we do not see how the reasonable viewer could be ignorant of the difference between arrest and conviction but knowledgeable enough to credit a dismissal

25

for lack of evidence. Even assuming away *ad arguendo* the inherent tension in Lichfield's theory, his argument has a bigger problem.

That problem is context. "Trying to focus on the defamatory words alone would be like trying to appreciate a pointillist painting by Seurat with a magnifying glass—the telling pattern would be lost in a maze of dots." *Hogan*, 762 F.3d at 1106 (quoting Dobbs at § 526 (2d ed. 2014)). The relevant context here is that throughout the series Kubler calls for law enforcement and government officials to investigate and punish executives in the troubled-teen industry. *See, e.g.*, The Program, *Part 3* at 49:30. Indeed, the very thesis of Kubler's policy stance in the third episode is that executives like Lichfield have evaded liability for their mistreatment of children. And just after the challenged segment, Kubler narrates that Lichfield re-opened the Costa Rican facility seven months after the raid and his arrest. *See* The Program, *Part 3* at 30:53. Thus, if the series had included the additional facts pleaded in the Amended Complaint – that charges "were voluntarily dropped by the public prosecutor," which is "a nearly unprecedented outcome given the severity of the underlying allegations," Aplt. App. at 24 – the gist of the challenged statement would remain the same. Or, in other words, the inclusion of this additional information would produce no "different effect," *Schwartz*, 215 F.3d at 1146, than that already conveyed: executives in the troubled-teen industry tend to avoid legal liability for what the speaker argues to be misconduct.

26

Additionally, a series such as The Program will always be subject to an editing process that "obviously entails professional judgment. In this process material that is flattering or critical of a particular person may be included or eliminated." *Machleder v. Diaz*, 801 F.2d 46, 54 (2d Cir. 1986). A person who is the subject of the speech is not entitled to hold the editor's pen or exercise a producer's review merely because he is the subject of a given segment or article. Just as a state legislature may not require newspapers to publish the responses of political candidates to unfavorable stories, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974), a private plaintiff is not entitled to the publication of every fact that might cast him "in a more favorable or balanced light," *Brokers' Choice*, 861 F.3d at 1108 (quotation omitted). So long as there is no statement of material falsehood – implied or otherwise – the director, editor, and producer must be free to exercise their collective editorial discretion.

Here, the "substance," "gist," and "sting" of the challenged statement "can be justified." *Masson*, 501 U.S. at 516–17. In other words, Lichfield has not shown this speech contained material falsehood. And without material falsity, there has been no defamation. *Brokers' Choice*, 861 F.3d at 1108. The district court correctly found that the purported omission cannot render the truth of this segment defamatory. We agree that the second challenged segment is also not susceptible to defamatory meaning as a matter of law.

27

**3**

We turn now to the third challenged segment to determine whether it is susceptible to a defamatory meaning. The scene in question begins at a Utah karaoke bar, where Kubler drinks from a pint glass and Lichfield performs a song first recorded by Frank Sinatra. The Program, *Part 3* at 47:39. While Lichfield dances, Kubler narrates:

> It was surreal to see Narvin in person, knowing everything I know about this guy: the children he abused, the parents he conned, all the crimes he's gotten away with. Yet, here he is – free as a bird, singing Frank Sinatra at a club in Utah. I didn't talk to him because I didn't want to blow my cover. And I don't like giving abusers a platform to spew their bullshit.

*Id.* at 48:04. Once Lichfield has returned to his seat, Kubler takes a drink from a shot glass chased with lime before performing Blondie's "One Way or Another" with two friends. *Id.* at 48:30.

On appeal, Lichfield contends that Kubler's narrative statement is defamatory because it makes provably false assertions of facts. This is the closest call of the three challenged segments. But, ultimately, like the statements associated with the first two segments, Kubler's statements are not defamatory as a matter of law.

The inquiry again centers on whether the "statements were false, defamatory, and not subject to any privilege." *Hogan*, 762 F.3d at 1105 (quoting *West*, 872 P.2d at 1007–08). When determining whether a

28

statement is defamatory, the inquiry consists of "a context-driven assessment of the alleged defamatory statement." *O'Connor*, 165 P.3d at 1222. And our contextual analysis relies on the four factors discussed above: "(1) the words themselves and their implications; (2) the entire article or message; (3) the events or disputes that gave rise to the article; and (4) the likely effect on the reasonable reader." *Hogan*, 762 F.3d at 1106.

Also relevant is a question of privilege. Article I of the Utah Constitution protects expression of opinion even where that opinion might otherwise be defamatory. *West*, 872 P.2d at 1017. And the Utah Supreme Court has provided a non-exhaustive four factor test to discern whether a given statement is either factual – and thus potentially susceptible to defamatory meaning – or privileged opinion. *See id.* at 1018. The factors include:

1)  "[T]he common usage or meaning of the words used;"

2)  "whether the statement is capable of being objectively verified as true or false;"

3)  "the full context of the statement – for example, the entire article or column – in which the defamatory statement is made; and"

4)  "the broader setting in which the statement appears."

*Id.* (citing *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) (en banc)).[6]

The First Amendment does not provide "a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990). But similar principles as those applicable under the Utah Constitution are operative, including a requirement that the plaintiff show proof of both fault and falsity, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986), thus exempting from liability statements made by media defendants on matters of public concern that constitute only "rhetorical

---

[6] This non-exhaustive list of factors bears some resemblance to the factors relevant to determining whether a statement's context renders it non-defamatory despite its literal words. *Cf. Hogan*, 762 F.3d at 1106 (citing Dobbs at § 526 (2d ed. 2014)). The partial overlap makes sense: there, the inquiry is whether, in context, a statement is defamatory and "convey[s] a false representation of fact." *Id.* (quotation omitted). Here, the inquiry is whether the statement is a privileged opinion rather than a factual assertion. We recognize, as a general matter, that opinions privileged by the Utah Constitution might also (though not always) independently fail to constitute defamation in the first instance because they convey no objectively verifiable fact.

hyperbole," *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970). And statements that may not "'reasonably be interpreted as stating actual facts' about an individual" are protected. *Milkovich*, 497 U.S. at 20 (alteration adopted) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)). These First Amendment principles can reasonably be said to protect at least "evaluative opinions." *Moody's Investor's Servs.*, 175 F.3d at 853. This means that statements that are "too indefinite to be proven true or false," that are not subject to proof of falsity by objective evidence, or that are based on factual premises that have already been "fully disclosed" are exempt from liability under the First Amendment. *Id.* at 853–54 (collecting cases).

Kubler argues on appeal that her statements made at the karaoke bar are protected by the constitutions of both the United States and Utah. We agree. In this posture, we determine whether the First Amendment protects Kubler's statements by looking to whether they are mere evaluative opinions constituting "rhetorical hyperbole" or "imaginative expression[]" rather than "stating actual facts" about Lichfield. *Mink v. Knox*, 613 F.3d 995, 1005 (10th Cir. 2010) (quotation omitted). Because this analysis overlaps heavily with Utah's constitutional analysis, *see West*, 872 P.2d at 1018, we will discuss the doctrines in parallel.

Begin with the introductory clause: "It was surreal to see Narvin in person[.]" The Program, *Part 3* at 48:04. Because it describes the experience of

31

seeing Lichfield in person, we can infer that the clause is drawn from the speaker's personal experience. This conclusion is further reinforced by the word "surreal," which itself is a subjective, qualitative descriptive term. Because there is nothing inherently surreal about seeing a person singing karaoke, we can easily infer that Kubler is describing her personal and subjective experience in this segment.

And, in the next portion of the sentence, the narrator makes explicit the reason for her experience of sur-reality: her personal knowledge. She continues: "knowing everything I know about this guy: the children he abused, the parents he conned, all the crimes he's gotten away with." *Id.* at 48:07. Here, in referencing what she knows, Kubler ties the subjectivity of her experience to purportedly real-world occurrences. But the question remains whether these occurrences are "capable of being objectively verified as true or false." *West*, 872 P.2d at 1018. Or, in the language of the First Amendment, whether they are "evaluative opinions," that are "too indefinite to be proven true or false," *Moody's Investor's Servs.*, 175 F.3d at 853, or "rhetorical hyperbole" that falls short of "stating actual facts" about Lichfield. *Mink*, 613 F.3d at 1005.

Kubler makes three allegations that she presents as personal knowledge. The first is that there are children whom Lichfield "abused." This could be understood in a certain context to mean specific types of abuse. For instance, if a prosecutor at a criminal hearing in a Utah courtroom represented to a judge

32

that a particular person abused children, a reasonable listener would understand that to be an accusation of violating the state's prohibition on child abuse. *See* Utah Code Ann. § 76-5-109. But there are other meanings that the relevant term "abused" can and does take in common speech. Elsewhere in the series, the term "abuse" is used to refer to Ivy Ridge staff members' use of physical restraints that seem to at least border on assault. *See*, *e.g.*, The Program, *Part 1* at 33:20. This term is also used to refer to an adult's sexual exploitation of juveniles. *See id.* at 41:45; The Program, *Part 2* at 59:20. But it is additionally used to refer to allegations of "isolation" and "brainwashing." The Program, *Part 2* at 14:44.

In the Amended Complaint, Lichfield concedes that the term may be used malleably. He alleges:

> The [s]eries presented allegations of "abuse" that conflate loose definitions of abuse with actual claims of legal abuse, characterizing the military academy-style discipline of grossly troubled and criminally convicted teenagers (such as by turning ninety degrees at corners) as abuse while then accusing youth programs it claims Narvin was involved with of legitimate abuse, such as assault.

Aplt. App. at 18.

Dictionaries confirm that the term can take a broad range of meanings. People have been abused when they are "treat[ed] without consideration or fairness," *Abuse*, Webster's Third New International Dictionary 8 (2002), "treat[ed] . . . with cruelty or violence," *Abuse*, New Oxford American

33

Dictionary 7 (3d ed. 2010), or "hurt or injure[d] by maltreatment," *Abuse*, American Heritage Dictionary of the English Language 8 (5th ed. 2016). These broader definitions surely capture conduct that would fall outside the scope of criminal statutes. So, we will need to reference more than just the literal words that are challenged. Here, again, context is critical.

Turning back briefly to our hypothetical criminal proceeding, we would say that the "full context" of a prosecutor's statement would incorporate the "common usage" of the words in that setting to mean that the prosecutor referred to a violation of Utah's criminal law. *See West*, 872 P.2d at 1018. And such a statement would be "capable of being objectively verified," presumably by a jury or other factfinder responsible for adjudicating guilt. *See id.* But when looking to the "full context" of Kubler's statement and the "broader setting in which [it] appears," *West*, 872 P.2d at 1018, we reach a different conclusion.

To begin with, Kubler is not a prosecutor, and she did not speak in the context of a criminal hearing. She spoke, instead, in a narrative dubbed over top of video showing people drinking, dancing, and singing karaoke. Shortly after the challenged segment, Kubler, speaking to the camera from a front porch, underlines her lack of legal training. During this monologue she concedes that she does not know if a law enforcement agency will investigate Lichfield, whether he will be subject to prison time, or whether he will be subject to "whatever punishment is due for people who abuse children." The

34

Program, *Part 3* at 49:45. After all, Kubler concedes, "I'm not a law enforcement agency, I'm just a kid trying to expose the truth. And it really just started out just to show my dad because he didn't believe me." *Id.* at 50:05.

Indeed, Kubler is the quintessential unreliable narrator. She admits that she is "not a real journalist" and more of an "amateur gumshoe." *Id.* at 3:11. Elsewhere in the series she compares herself to the wrongly-imprisoned protagonist in *The Count of Monte Cristo* and acknowledges that she returned to Ivy Ridge to get "revenge." The Program, *Part 1* at 27:47. And this story of revenge is expressly personal. In the series' early segments, she describes "look[ing] back at" her home videos "and try[ing] to pinpoint where things went wrong." *Id.* at 5:05. She describes her mother's death from cancer, *id.* at 5:32, and her father's re-marriage to her "evil stepmother," *id.* at 6:08. Kubler recounts that when things "got really bad at home," she began "beg[ging] her dad to go somewhere, anywhere, as long as [Kubler] didn't have to stay with" the stepmother. *Id.* at 6:46. The series explains that Kubler enrolled in a religious boarding school, and then, upon getting expelled, was taken to Ivy Ridge.

This is not only an origin story but a personal narrative framework around which the series is built. It is interspersed with clips from Kubler's childhood home videos, *see, e.g., id.* at 4:31; The Program, *Part 3* at 51:58, and she repeatedly cries while discussing the effect of her experience at Ivy Ridge

35

on her familial relationships, *see, e.g.*, The Program, *Part 2* at 21:40 (conversation with sisters); *id.* at 53:10 (conversation with father); The Program, *Part 3* at 50:05 (monologue to camera). While interviewing a purported "cult expert," Kubler says that she's "been going through a years-long process to try to deprogram" her father from what she believes to be a cult. The Program, *Part 2* at 42:25. She cuts off in-person communication with him and reproduces images of his emails on screen. *See, e.g., id.* at 43:11. When they meet in person for the first time in years, she records it. *Id.* at 54:20. The meeting is not exactly mutually amicable. When he arrives, he is apparently unaware that he was going to be recorded. The first thing she asks him is: "What do you have to say for yourself?" *Id.* at 54:50.

In addition to centering her familial relationships in the narrative, Kubler also discusses the effects of her childhood experiences in the troubled-teen facility on her mental health. When burning files apparently taken from Ivy Ridge's abandoned campus, she tells her friends: "[T]his is therapy." The Program, *Part 3* at 59:40. She is also shown apparently engaging in literal talk therapy, *id.* at 57:34, and discusses her symptoms of complex post-traumatic stress disorder, *id.* at 56:58, and anxiety, which she attributes to her time at Ivy Ridge, The Program, *Part 2* at 57:45.

Kubler does not just articulate these negative experiences and outcomes and attribute them to the troubled-teen industry, she also advocates for public

36

policy changes and law enforcement intervention. When interviewing a Utah state senator, she asks him to watch the series to determine if Robert Lichfield – the Plaintiff-Appellant's brother – should be put on a "blacklist." The Program, *Part 3* at 46:40. In a different segment, she calls for law enforcement "get their shit together and investigate." *Id.* at 49:45. And in the concluding minutes of the series, she broadens her demand for change: "There are thousands of children still trapped in these programs . . . the abuse of a child is the business of anyone who knows about it. And now you know." *Id.* at 1:03:35.

This is all to say that, contrary to the operative complaint, the series does not "present[] itself as an objective documentary" as a reasonable viewer would understand it. *Contra* Aplt. App. at 16. Kubler admits that she has an axe to grind and that her films are intended to be a piquant commentary on boarding schools for troubled teens. The series Kubler created is, at times, highly personal. It seeks to convince her father that her complaints are non-frivolous. And, simultaneously, it seeks to motivate law enforcement, legislators, and the public to modify their positions on the troubled-teen industry. Given this operative context and the broad range of meanings that the word "abused" can take, it is impossible to objectively verify whether or not Lichfield abused children in the meaning expressed by this segment.

In fact, a reasonable viewer would understand that Kubler refers to abuse in this context not to accuse Lichfield of some discrete act never aired, but to argue that he is responsible for conduct facilitated by WWASP that – in her view, and described elsewhere in the series – *should be considered* abuse, whether or not it is violative of a particular criminal statute. As Lichfield concedes on video, he's "either a sinner or a saint based on whatever argument you want to believe." The Program, *Part 3* at 24:01. Kubler wants you to believe Lichfield is a sinner, not a saint. That is precisely the sort of subjective view that the Utah Constitution protects as privileged opinion. *See West*, 872 P.2d at 1018. And, similarly, under the First Amendment, she has stated "evaluative opinions," *Moody's Investor's Servs.*, 175 F.3d at 853, consisting of – at most – "rhetorical hyperbole," *Greenbelt*, 398 U.S. at 14.

Kubler's references to "the parents [Lichfield] conned," and "all the crimes he's gotten away with" do nothing to change this conclusion. *See* The Program, *Part 3* at 48:04. Like "abused," the term "conned" takes a broad range of meanings. And it is used earlier in the episode to refer to WWASP's business model of "holding children hostage in remote locations with unqualified staff, while they con parents with cult-like seminars and collect the checks." *Id.* at 22:20. So, again, the context shows that Kubler is not accusing Lichfield of some separate criminal fraud but instead critiquing a business model that she views and presents as illegitimate.

38

This court has previously credited the proposition that "lying" may be nonactionable hyperbole because it applies to a "spectrum of untruths." *See Brokers' Choice*, 861 F.3d at 1136 n.92 (citing *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995). And we have also recognized that the First Amendment protected a news broadcast's opinion that a particular product was a "scam," *Moody's Investor's Servs.*, 175 F.3d at 854 (citing *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 11–12 (Colo. 1994) (en banc)), because the statement expressed "nothing more than his judgment that people need not pay for a [certain product] because they can get [the most valuable portion] free," *Living Will Ctr.*, 879 P.2d at 11. The same principle applies here. Indeed, its application is even more powerful where it is presented not by a traditional broadcast journalist but by a self-admitted "amateur gumshoe" who thinks of herself as a "kid" and admits she is out for "revenge."

For its part, "crime[]" can reasonably be said to refer to conduct prohibited by the broad scope of the criminal law. To the extent that Kubler could be alleging that Lichfield violated some already extant criminal statutes (and is not merely arguing for a shift in public policy to create new substantive crimes), her amorphous allegations are untethered from specific allegations of criminal activity that could be actionable under defamation laws. This sort of general reference to criminal activity is the sort of thing that is not "capable of

39

being objectively verified as true or false," *West*, 872 P.2d at 1018, because "there is simply no objective evidence that could prove that [it is] false," *Moody's Investor's Servs.*, 175 F.3d at 854.

The broad-sweeping and inherently subjective language of Kubler's statements, in conjunction with context that exacerbates their subjectivity, render her speech protected as privileged opinion under the Utah Constitution and as evaluative opinion under the First Amendment. The district court correctly held that Lichfield failed to allege a statement capable of defamatory meaning in this third contested segment.

## C

We next turn to Lichfield's anti-SLAPP arguments made on appeal, which differ from the argument he made before the district court. On appeal, Lichfield argues that "state anti-SLAPP laws do not apply in federal diversity actions under *Erie*." Op. Br. at 48 (bolding and capitalization omitted). Additionally, he argues that the district court independently erred by treating the anti-SLAPP standard as equivalent to Rule 12(b)(6) and "impos[ing] a consequence (fee-shifting) that would not normally attach" to dismissal under that Rule. *Id.* at 53. But Lichfield made neither of these arguments in the district court. In fact, his district court arguments were directly contrary to the arguments now made on appeal.

The invited error doctrine "prevents a party who induces an erroneous ruling from being able to have it set aside on appeal." *United States v. Burson*, 952 F.2d 1196, 1203 (10th Cir. 1991). Or, stated otherwise, it "precludes a party from arguing that the district court erred in adopting a proposition that the party had urged the district court to adopt." *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) (quoting *United States v. DeBerry*, 430 F.3d 1294, 1302 (10th Cir. 2005)). Because the doctrine only applies when the party has decided to argue a particular point, it is treated as a species of waiver, rather than forfeiture. *Id.* (citing *United States v. Zubia-Torres*, 550 F.3d 1202, 1206 (10th Cir. 2008)).

The doctrine applies here. In the district court, Kubler filed an omnibus motion to dismiss under Rule 12(b)(6) and to strike pursuant to state anti-SLAPP laws. In the motion, she argued that Utah and California anti-SLAPP laws are identical for the purposes of this case, and – in the alternative – that the district court should apply California's law. Lichfield filed a brief in opposition. On the first page of his brief, he included a footnote stating: "Lichfield argues that the Utah [anti-SLAPP law] should be applied to all claims in this matter." Aplt. App. at 225 n.1. Then, he headed the relevant subsection of his brief, in bold: "The Utah [Anti-SLAPP Law] Applies." *Id.* at 239. In support of this argument he cited to *Erie Railroad Co. v. Tompkins* for the proposition that "federal courts sitting in diversity apply the forum state's

41

substantive law." *Id*. at 240 (citing 304 U.S. 64 (1938)). He went on to argue that application of the Utah law "does not automatically dismiss [his] claims. The court must still conduct a claim-by-claim analysis under the Rule 12(b)(6) standard." *Id*.

So, when Lichfield now argues on appeal that "under binding Tenth Circuit precedent, the district court should have denied the anti-SLAPP motion outright on *Erie* grounds," Op. Br. at 52, his audience is unreceptive. Lichfield made precisely the opposite argument in district court: that *Erie* should lead to application of Utah anti-SLAPP law and that his claims survived the motion. Lichfield could have argued to the district court that state anti-SLAPP laws are categorically inapplicable in federal court, and – in the alternative – that Utah law would be the appropriate choice of law if application of such laws did comport with *Erie*. *Cf. Peterson*, 707 F.3d at 1208. But Lichfield made no such argument. Thus, on appeal, he "cannot be heard to complain of any [such] alleged error." *Id*.

The same principle applies to Lichfield's argument that the district court erred by treating the anti-SLAPP standard as equivalent to Rule 12(b)(6). He asked the district court to follow that procedure. Now, unhappy with the result, he complains that the district court accepted his argument. He has invited these errors, and so he must live with them. We treat Lichfield's anti-SLAPP arguments as waived.

42

**D**

Lichfield additionally argues that the district court erred by dismissing his suit without granting him leave to amend the complaint. But he also implicitly concedes that he did not move for leave to amend in the manner contemplated by our caselaw. *See* Reply Br. at 24–25. And he is right to concede, because his opposition to dismissal in the district court contained only one line requesting leave to amend, and only if Kubler's motion was granted. This court has said that a "single sentence, lacking a statement for the grounds for amendment and dangling at the end of [a] memorandum [does] not rise to the level of a motion for leave to amend." *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999). We think it makes no difference for purposes of this rule that Lichfield's single sentence appeared on the first, rather than last, page of his opposition briefing. Because he did not move for leave to amend in the manner required, the district court "did not abuse its discretion in failing to address [his] request." *Id.*

**E**

Finally, we address an issue that only became operative on appeal. In his Opening Brief, Lichfield included citation to a legal authority that does not exist, *see* Op. Br. at 39, and characterized two cases in manners wholly unsupported by the text of the opinions, *see* Op. Br. at 43, 45. Kubler pointed out these errors in response, *see* Resp. Br. at 48–49, and although Lichfield

conceded in reply that his Opening Brief "contained several citation errors" and contended that the errors "h[ad] been corrected," he did not file a corrected brief, *see* Reply Br. at 6. When questioned at oral argument, counsel offered to file a notice directly correcting the statements at issue. And, indeed, the authoring attorney filed the next day a Notice of Errata, identifying the specific errors in the opening brief and providing actual, existing authority that could support the arguments made.

The rules of this court provide that when an attorney presents a brief to the court, they certify, *inter alia*, that they have undertaken a reasonable inquiry to ensure that "the issues presented are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law." 10th Cir. R. 46.5(B)(2). It should go without saying that a bare-minimum reasonable inquiry will ensure legal authorities cited in papers submitted to the court actually exist, and the quotations or propositions attributed to them also exist. The Opening Brief in this case therefore failed to fully comply with Rule 46.5.

The filing of this non-compliant brief is conduct sanctionable at our discretion. 10th Cir. R. 46.5(C). Our rules empower us to issue *sua sponte* sanctions, which may include: dismissal of the appeal, an order of monetary payments, initiation of disciplinary proceedings, and an order to pay the

opposing party's reasonable expenses that resulted from the paper in question. *Id.*

This court has recently issued sanctions for the use of generative artificial intelligence that resulted in the filing of a brief with citations to seven cases that do not exist and two cases that do exist but do not contain the quotations that the briefing alleged. *Amarsingh v. Frontier Airlines, Inc.*, No. 24-1391, 2026 WL 352016, at \*5 (10th Cir. Feb. 9, 2026) (unpublished).[7] There, the filer – who is a barred attorney but was litigating the case pro se – addressed the issue with "candor," and we stated that we "appreciate that she is willing to try to do better" and "may have taken steps in that direction." *Id.* at \*6. But this was ultimately not sufficient to wholly mitigate her frivolous argument. *Id.* at \*7. We thus ordered the attorney to pay $1,000 to offset opposing counsel's fees and costs and directed the Clerk's Office to refer the matter to the relevant disciplinary body. *Id.* at \*7–8.

Here, the errors are not as egregious. Although we assume the use of generative artificial intelligence led to the misrepresentations of legal authority, the brief here had significantly fewer errors than in *Amarsingh*. But, on the other hand, generative artificial intelligence is no longer a novel tool. Attorneys who choose to use it must be willing to also apply "actual intelligence

---

[7] We cite unpublished decisions for their persuasive value only and do not treat them as binding precedent. 10th Cir. R. 32.1(A).

in its execution." *Id.* at *6 (quotation omitted). We are further concerned that the Reply Brief did not appropriately remedy the misstatements of law. After briefly acknowledging "several citation errors" and contending that they "have been corrected," counsel went on to attack the opposing party. Reply Br. at 6. He contended that "[t]he more significant issue" was "mischaracterizations of controlling authority" in the Response Brief. *Id.* But those purported mischaracterizations were grounded in the words of cases that indeed exist. It is the court that decides which issues are "more significant." And the errors in the Opening Brief are more significant in this case.

We appreciate that counsel filed a Notice of Errata the day after oral argument. But it should not have taken questioning at argument to elicit such a response. Submission of a brief containing fabricated or hallucinated citations is a divergence from the standards expected of attorneys appearing before this court. Any such error should be corrected explicitly and without prompting.

The missteps in this case do not merit sanctions. However, counsel should take note that although generative artificial intelligence may attract with the promise of less laborious brief writing, its use may result in hallucinated falsities. Counsel is responsible for ensuring briefs and

representations made to the court are warranted by the law and supported by

the record, no matter the technology used to create them.

AFFIRMED.